# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF VIRGINIA
# BIG STONE GAP DIVISION

| | |
|---|---|
| **TIMOTHY J. ROSE,** ) | |
| Plaintiff ) | Civil Action No. 2:22cv00023 |
| ) | |
| v. ) | **REPORT AND** |
| ) | **RECOMMENDATION** |
| **MARTIN J. O'MALLEY,**[1] ) | |
| **Commissioner of Social Security,** ) | By: PAMELA MEADE SARGENT |
| Defendant ) | United States Magistrate Judge |
| ) | |

*I. Background and Standard of Review*

Plaintiff, Timothy J. Rose, ("Rose"), filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying his claim for disability insurance benefits, ("DIB"), under the Social Security Act, as amended, ("Act"), 42 U.S.C. § 423 *et seq.* Jurisdiction of this court is pursuant to 42 U.S.C. § 405(g). This case is before the undersigned magistrate judge by referral pursuant to 28 U.S.C. § 636(b)(1)(B). Neither party has requested oral argument; therefore, this case is ripe for decision. As directed by the order of referral, the undersigned now submits the following report and recommended disposition.

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which

---

[1] Martin J. O'Malley, ("O'Malley"), became the Commissioner of Social Security on December 20, 2023. Pursuant to Federal Rules of Civil Procedure Rule 25(d), O'Malley should, therefore, be substituted for Kilolo Kijakazi as the defendant in this case. Pursuant to the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), no further action is required to continue this suit.

-1-

a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Rose protectively filed his application for DIB[2] on July 10, 2019, alleging disability as of January 3, 2016, based on spinal stenosis. (Record, ("R."), at 18, 176-77, 200.) The claim was denied initially and upon reconsideration. (R. at 100-18.) Rose then requested a hearing before an administrative law judge,

---

[2] Rose previously filed applications for DIB and supplemental security income, ("SSI"), on May 17, 2011, alleging disability as of June 5, 2009. (R. at 61.) By decision dated February 1, 2013, the ALJ denied his claims. (R. at 61-73.)

Pursuant to the Fourth Circuit's opinion in *Albright v. Comm'r of Soc. Sec. Admin.,* 174 F.3d 473 (4th Cir. 1999), and in accordance with Social Security Acquiescence Ruling, ("AR"), 00-1(4), "[w]hen adjudicating a subsequent disability claim arising under the same…title of the Act as the prior claim, an adjudicator determining whether a claimant is disabled during a previously unadjudicated period must consider such a prior finding as evidence" and consider its persuasiveness in light of all relevant facts and circumstances. A.R. 00-1(4), 65 Fed. Reg. 1936-01, at *1938, 2000 WL 17162 (Jan. 12, 2000). It is noted that, when *Albright* was decided, the agency "weighed" opinion evidence under different standards. *See* 56 Fed. Reg. 36932-01, at *36960, 1991 WL 142361 (Aug. 1, 1991). Those standards have been superseded by 20 C.F.R. §§ 404.1520c, 416.920c, which prescribe how to consider persuasiveness of opinion evidence and prior administrative findings in claims made on or after March 27, 2017. Because this claim was made after March 27, 2017, the ALJ is required to consider prior ALJ decisions and Appeals Council findings under *Albright. See* Program Operations Manual System, ("POMS"), DI 24503.005, available at https://policy.ssa.gov/poms.nsf/lnx/0424503005 (effective Apr. 13, 2021) (explaining the categories of evidence).

The ALJ in this case noted he reviewed the previous February 2013 decision and found it unpersuasive because it was not consistent with the medical evidence of record for the period from the alleged onset date through the date last insured. (R. at 26.) The ALJ noted that there was a significant period of time from the February 2013 decision and the alleged onset date for the current claim and, during which time, Rose was able to return to work at the heavy level of exertion. (R. at 26.)

-2-

("ALJ"). (R. at 119-20.) The ALJ held a hearing on February 9, 2021, at which Rose was not represented by counsel. (R. at 33-57.)

By decision dated March 23, 2022, the ALJ denied Rose's claim. (R. at 18-28.) The ALJ found Rose met the nondisability insured status requirements of the Act for DIB purposes through December 31, 2016. (R. at 20.) The ALJ found Rose had not engaged in substantial gainful activity since January 3, 2016,[3] the alleged onset date. (R. at 20.) The ALJ determined that Rose had severe impairments, namely, degenerative disc disease of the cervical and lumbar spine, but she found Rose did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 20, 22.)

The ALJ found that Rose had the residual functional capacity to perform light work,[4] except he could never climb ladders, ropes or scaffolds; he could occasionally climb ramps and stairs, balance, stoop, kneel, crouch and crawl; he could frequently reach, handle, finger and feel; and could have no exposure to dangerous machinery with moving mechanical parts or unprotected heights. (R. at 23.) The ALJ found that Rose was unable to perform his past relevant work. (R. at 27.) Based on Rose's age, education, work history and residual functional capacity and the testimony of a vocational expert, the ALJ found a significant number of jobs existed in the national

---

[3] Therefore, Rose must show he was disabled between January 3, 2016, the alleged onset date, and December 31, 2016, his date last insured, to be eligible for benefits.

[4] Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or carrying of items weighing up to 10 pounds. If someone can perform light work, he also can perform sedentary work. *See* 20 C.F.R. § 404.1567(b) (2022).

economy that Rose could perform, including the jobs of a sales attendant, a storage rental clerk and a marker of price tags. (R. at 27-28, 55.) Thus, the ALJ concluded that Rose was not under a disability as defined by the Act from January 3, 2016, through December 31, 2016, the date last insured, and he was not eligible for DIB benefits. (R. at 28.) *See* 20 C.F.R. § 404.1520(g) (2022).

After the ALJ issued her decision, Rose pursued his administrative appeals, (R. at 170-72), but the Appeals Council denied his request for review. (R. at 1-5.) Rose then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. § 404.981 (2022). This case is before this court on Rose's motion for summary judgment filed May 1, 2023, and the Commissioner's motion for summary judgment filed May 24, 2023.

## II. Facts

Rose was born in 1964, (R. at 27, 35), which, at the time of the alleged disability date, classified him as a "person closely approaching advanced age," and at the time of the ALJ's decision, classified him has a "person of advanced age." *See* 20 C.F.R. § 404.1563(d), (e). Rose obtained a general educational development, ("GED"), diploma and has past work experience as a cleanout driller, a helper, and a section supervisor for a coal mine. (R. at 42, 53-54, 201.) Rose testified at his hearing that he was unable to work due to back pain. (R. at 47.) He stated ibuprofen and daily use of a TENS unit helped his pain. (R. at 47-48.) He stated he underwent back surgery in 2017, which helped his pain a "little bit." (R. at 48.) Rose stated he continued to experience neck pain and difficulties with his hands and fingers. (R. at 48-49.) He stated he had surgeries on both hands and elbows, and he experienced weakness in both. (R. at 49.) Rose stated he could lift and carry up to 10 pounds.

(R. at 49.) He stated that walking worsened his pain, and sitting for longer than 10 minutes caused pain and numbness. (R. at 49.) Rose stated he had meniscus repair to his right knee in January 2020, which was helpful. (R. at 50.)

In rendering his decision, the ALJ reviewed records from Dr. Bert Spetzler, M.D., a state agency physician; Dr. Jack Hutcheson, M.D., a state agency physician; Pikeville Medical Center; Appalachian Orthopedic and Spine Center, LLC, ("Appalachian Orthopedic"); Community Physicians; Community Orthopedics; Southwest Virginia Cancer Center, ("Cancer Center"); and Mountain View Regional Medical Center, ("Mountain View").

On February 3, 2016, Rose sustained a work-related back injury. (R. at 506.) On March 10, 2016, an MRI of Rose's lumbar spine showed a small focal central disc protrusion at the T12-L1 level; a small to moderate left-sided herniation at the L1-L2 level; a mild annular bulge at the L2-L3 level; a broad-based herniation causing spinal canal and neural foramina stenosis at the L3-L4 level; a moderate right paracentral disc herniation at the L4-L5 level; and a moderate to large central herniation at the L5-S1 level. (R. at 523.) On June 27, 2016, Rose saw Dr. Mukut Sharma, M.D., an orthopedic surgeon with Appalachian Orthopedic, reporting low back and left leg pain. (R. at 519.) He stated he had three epidural steroid injections, which did not help his pain. (R. at 519.) Rose's lumbosacral spine exhibited tenderness on palpation, muscle spasms and limited range of motion; his straight leg raising tests were positive; he had a positive Faber test at the sacroiliac, ("SI"), joints, bilaterally; and his ankle jerk reflex was abnormal. (R. at 519.) Dr. Sharma diagnosed lumbar disc degeneration at the L3-L4 and L4-L5 levels and lumbosacral disc degeneration. (R. at 520.) A TENS unit was prescribed. (R. at 520.)

On September 30, 2016, Rose saw Vada Rose, N.P., a nurse practitioner with Community Physicians, ("V. Rose"), reporting back, neck and left shoulder pain. (R. at 574.) Rose was in no acute distress, and his extremities had no edema. (R. at 576.) On October 10, 2016, Rose saw V. Rose, reporting back and neck pain. (R. at 567.) He stated he could not sit, stand or walk longer than 15 minutes without interruption. (R. at 571.) Rose was in no acute distress; his extremities had no edema; and he had limited range of motion with bending forward, backward and side to side. (R. at 569-71.) V. Rose removed a piece of metal from the right side of Rose's neck.[5] (R. at 571.)

On November 10, 2016, Rose saw Dr. Norman W. Mayer, M.D., a physician with Pikeville Medical Center, reporting low back pain that radiated to his bilateral lower extremities. (R. at 462.) Rose reported physical therapy and lumbar epidural injections provided no significant improvement. (R. at 465.) Rose reported his pain was relieved by heat and the use of a TENS unit. (R. at 462.) Rose had decreased sensation to light touch at the left anterior thigh, and his balance, gait, coordination, deep tendon reflexes and fine motor skills were normal. (R. at 464.) Rose elected to proceed with a lumbar decompression at the L3-L4 level. (R. at 465.)

On January 6, 2017, Rose underwent a lumbar decompression at the L3-L4 level, bilaterally. (R. at 242-339.) On February 23, 2017, Rose underwent an incision and drainage procedure for a post-operative wound infection. (R. at 353-454) At his post-operative follow-up visits, Rose reported improvement, he ambulated without

---

[5] Metal was discovered in Rose's neck while he was being prepped for an MRI. (R. at 571.) In September 2016, x-rays of Rose's neck showed a small metallic foreign body in the inferior right side of the neck and degenerative changes in the cervical spine and uncovertebral joints, most prominent at the C3-C5 discs. (R. at 584-86.)

assistance and was placed at maximum medical improvement.[6] (R. at 350, 466, 470, 473, 497.)

On April 18, 2017, Rose saw Dr. Mayer, reporting good response to medication, and he stated his activity level was back to pre-operative level, but he continued to report back pain. (R. at 481.) Rose denied numbness and tingling. (R. at 481-82.) Dr. Mayer ordered aquatic therapy.[7] (R. at 486.)

On May 12, 2017, Rose saw V. Rose, reporting neck and back pain radiating into his legs and feet. (R. at 562, 566.) He reported his shoulder pain had improved. (R. at 562.) Rose was in no acute distress, and his extremities had no edema. (R. at 565.) On May 18, 2017, Rose saw Dr. Mayer, reporting low back pain that radiated into his left thigh. (R. at 500.) Dr. Mayer diagnosed spinal stenosis, lumbar region. (R. at 502.)

On August 31, 2017, Rose saw Dr. Mayer, reporting worsened low back pain that radiated into his right lower extremity. (R. at 494.) Rose's balance, gait and sensation were normal. (R. at 496.) Dr. Mayer ordered an MRI of Rose's lumbar spine. (R. at 497.) On November 2, 2017, Rose saw Dr. Mayer, reporting low back, left hip and buttocks pain with rare occasional numbness in his left leg. (R. at 506, 509.) An MRI of Rose's lumbar spine showed post-operative changes at the L3-L4 level with associated posterior scar tissue and trace fluid noted within the operative

---

[6] In May 2017, Dr. Mayer reported Rose had reached maximum medical improvement and assessed a 13 percent whole person impairment. (R. at 503.)

[7] Rose participated in two sessions of aquatic therapy and reported he received no improvement with his pain. (R. at 502, 504.)

bed; multi-level intervertebral disc space desiccation; degenerative end-plate changes; and spinal canal narrowing. (R. at 510-11.)

On January 15, 2018, Rose saw Brandie Dotson, A.P.R.N., an advanced practice registered nurse with Pikeville Medical Center, reporting back pain. (R. at 524.) Rose was discharged for chronic pain management after admitting to consuming alcohol two to three times per week. (R. at 524.) Rose was offered nonopioid therapy, excluding injections, but Rose declined. (R. at 524.)

From 2019 through May 2020, Rose saw V. Rose, reporting pain in his shoulders, back, knees, joints and bilateral wrist pain. (R. at 550, 555, 688, 717, 766.) Rose was in no acute distress; his extremities had no edema; his right knee had anterior and lateral tenderness; range of motion was painful in all planes; and he had restricted active range of motion. (R. at 553, 558, 720.) In February 2019, Rose was referred to an orthopedic doctor. (R. at 560.) In May 2019, V. Rose diagnosed bilateral carpal tunnel syndrome, dyslipidemia and nicotine dependence. (R. at 554.) In May 2020, Rose reported good symptom control of his hand pain. (R. at 688.)

On February 25, 2019, Rose saw Dr. James Price, M.D., a physician with Community Orthopedics, reporting right knee pain. (R. at 611.) X-rays of Rose's right knee showed slight narrowing and degenerative changes of the medial compartment with medial tibial plateau sclerosis. (R. at 619.) Dr. Price diagnosed right knee pain; tear of meniscus of right knee;[8] osteoarthritis of the right knee; and bilateral carpal tunnel syndrome. (R. at 614.)

---

[8] On January 10, 2020, Rose underwent right knee arthroscopy with partial medial and lateral meniscectomy. (R. at 651.)

On May 23, 2019, Rose saw Jeremiah Bush, P.A., a physician's assistant with Community Orthopedics, reporting bilateral wrist pain and numbness and tingling in his hands and fingers. (R. at 602.) Rose was diagnosed with bilateral carpal tunnel syndrome and bilateral cubital tunnel syndrome.[9] (R. at 605.) On July 3, 2019, Rose saw Bush, reporting back pain, which began after he changed a battery in a boat. (R. at 593.) X-rays of Rose's lumbar spine showed mild degenerative disc disease at the T12-S1 level. (R. at 620.) Rose was diagnosed with lumbar strain. (R. at 597.) Bush encouraged Rose to perform light lumbar stretching and use over-the-counter nonsteroidal anti-inflammatory drugs, ("NSAIDs"), to help with pain. (R. at 597.)

On September 27, 2019, Dr. Bert Spetzler, M.D., a state agency physician, found that the record showed that Rose was diagnosed with dyslipidemia, obstructive sleep apnea and lumbar radiculopathy, but there was insufficient evidence to fully evaluate Rose's claim within the time frame at issue. (R. at 82.)

On March 27, 2020, Dr. Jack Hutcheson, M.D., a state agency physician, found that the record showed Rose was diagnosed with dyslipidemia, obstructive sleep apnea and low back problems, but there was insufficient evidence to make a determination as to Rose's claim within the time frame at issue. (R. at 91.) Dr. Hutcheson noted imaging of Rose's neck in September 2016 showed a small metallic foreign body in the inferior right neck, and an MRI of Rose's lumbar spine performed in March 2016 showed disc bulges, herniation and spinal canal stenosis at the L3-L4 level. (R. at 91.)

---

[9] On June 21, 2019, Rose underwent left carpal tunnel and cubital tunnel release surgery. (R. at 667-68.) In July 2019, Rose reported doing well, and he denied any pain or discomfort in his elbow or wrist. (R. at 593.) On March 17, 2020, Rose underwent right endoscopic carpal tunnel release and right cubital tunnel release surgery. (R. at 634-35.)

In 2021, Rose was diagnosed with prostate cancer and received treatment from the Southwest Virginia Cancer Center. (R. at 735-39, 795-98, 822-65.)

### III. Analysis

The Commissioner uses a five-step process in evaluating DIB claims. *See* 20 C.F.R. § 404.1520 (2022). *See also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to his past relevant work; and 5) if not, whether he can perform other work. *See* 20 C.F.R. § 404.1520. If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. § 404.1520(a)(4) (2022).

Under this analysis, a claimant has the initial burden of showing that he is unable to return to his past relevant work because of his impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C. § 423(d)(2)(A); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

As stated above, the court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. This

court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided his decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all the relevant evidence and whether the ALJ sufficiently explained her findings and her rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Rose filed his application in July 2019; thus, 20 C.F.R. § 404.1520c governs how the ALJ considered the medical opinions here.[10] When making a residual functional capacity assessment, the ALJ must assess every medical opinion received in evidence. The regulations provide that the ALJ "will not defer or give any specific evidentiary weight, including controlling weight" to any medical opinions or prior administrative medical findings, including those from the claimant's medical sources. 20 C.F.R. § 404.1520c(a) (2022). Instead, an ALJ must consider and articulate how *persuasive* she finds all the medical opinions and all prior administrative medical findings in a claimant's case. *See* 20 C.F.R. § 404.1520c(b), (c)(1)-(5) (2022) (emphasis added). Moreover, when a medical source provides more than one opinion or finding, the ALJ will evaluate the persuasiveness of such opinions or findings "together in a single analysis" and need not articulate how he or she considered those opinions or findings "individually." 20 C.F.R. § 404.1520c(b)(1) (2022).

---

[10] 20 C.F.R. § 404.1520c applies to claims filed on or after March 27, 2017. *See* Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. 5844-01, 2017 WL 168819 (Jan. 18, 2017) (technical errors corrected by 82 Fed. Reg. 15132-01, 2017 WL 1105368 (Mar. 27, 2017)).

Case 2:22-cv-00023-JPJ-PMS   Document 16   Filed 01/17/24   Page 12 of 19
                               Pageid#: 1026

The most important factors in evaluating the persuasiveness of these medical opinions and prior administrative medical findings are supportability and consistency, and the ALJ will explain how she considered these two factors in her decision. *See* 20 C.F.R. § 404.1520c(b)(2). "Supportability" means "[t]he extent to which a medical source's opinion is supported by relevant objective medical evidence and the source's supporting explanation." Revisions to Rules, 82 Fed. Reg. at 5853; *see also* 20 C.F.R. § 404.1520c(c)(1). "Consistency" denotes "the extent to which the opinion is consistent with the evidence from other medical sources and nonmedical sources in the claim." Revisions to Rules, 82 Fed. Reg. at 5853; *see also* 20 C.F.R. § 404.1520c(c)(2). The ALJ is not required to explain the consideration of the other three factors, including relationship with the claimant, specialization and other factors such as an understanding of the disability program's policies and evidentiary requirements.[11] *See* 20 C.F.R. § 404.1520c(b)(2).

Rose's sole argument on appeal is that the ALJ erred by failing to give appropriate credence to his testimony and properly assess the effect of pain on his ability to perform substantial gainful activity. (Plaintiff's Memorandum In Support Of His Motion For Summary Judgment, ("Plaintiff's Brief"), at 4-5.)

Rose argues that his testimony that he suffers from severe and chronic daily pain, making it impossible for him to sit, stand, walk or concentrate for prolonged periods, is supported by the objective medical evidence and his continued treatment

---

[11] An exception to this is that when the ALJ finds that two or more "medical opinions or prior administrative medical findings about the same issue are both equally well-supported [] and consistent with the record [] but are not exactly the same," the ALJ will explain how he considered the other most persuasive factors including: the medical source's relationship with the claimant, specialization and other factors that tend to support or contradict a medical opinion. 20 C.F.R. § 404.1520c(b)(3) (2022).

for chronic pain. Rose argues that the ALJ failed to properly consider his testimony. Contrary to Rose's argument, the Commissioner contends that substantial evidence supports the ALJ's finding that Rose's allegations of disabling chronic pain are not entirely consistent with the medical and other evidence of record. As the Commissioner stated in his brief, apart from his hearing testimony, Rose did not cite to record evidence that would support further limitations or otherwise undermine the ALJ's decision.

The Fourth Circuit recently reiterated the two-step framework, set forth in 20 C.F.R. § 404.1529 and Social Security Ruling, ("S.S.R."), 16-3p, 2017 WL 5180304 (Oct. 25, 2017), for evaluating a claimant's symptoms, such as pain.[12] *See Arakas v. Comm'r, Soc. Sec. Admin.*, 983 F.3d 83 (4th Cir. 2020). First, the ALJ must determine whether objective medical evidence[13] presents a "medically determinable impairment" that could reasonably be expected to produce the claimant's alleged symptoms. *Arakas*, 983 F.3d at 95 (citations omitted); *see also Craig v. Chater*, 76 F.3d 585, 594 (4th Cir. 1996). Second, after finding a medically determinable impairment, the ALJ must assess the intensity and persistence of the alleged symptoms to determine how they affect the claimant's ability to work and whether he is disabled. *See Arakas*, 983 F.3d at 95 (citations omitted); *see also Craig*, 76 F.3d at 595. Because "[s]ymptoms cannot always be measured objectively through clinical or laboratory diagnostic techniques," ALJs must consider the entire case record and may "not disregard an individual's statements about the intensity,

---

[12] "Symptoms" are defined in the regulations as a claimant's own description of his medical impairment. *See* 20 C.F.R. § 404.1502(i) (2022).

[13] The regulations define "objective medical evidence" as "evidence obtained from the application of medically acceptable clinical and laboratory diagnostic techniques, such as evidence of reduced joint motion, muscle spasm, sensory deficit or motor disruption." 20 C.F.R. § 404.1529(c)(2) (2022).

persistence, and limiting effects of symptoms solely because the objective medical evidence does not substantiate" them. S.S.R. 16-3p, 2017 WL 5180304, at *5; *see also* 20 C.F.R. § 404.1529(c)(2); *Craig*, 76 F.3d at 595. In other words, "while there must be objective medical evidence of some condition that could reasonably produce the pain, there need not be objective evidence of the pain itself or its intensity." *Walker v. Bowen*, 889 F.2d 47, 49 (4th Cir. 1989); *see also Craig*, 76 F.3d at 593.

However, the Fourth Circuit has held that objective medical evidence and other objective evidence are "crucial" in evaluating the second prong of the symptom analysis test. *Craig*, 76 F.3d at 595. In *Craig*, the Fourth Circuit stated, "[a]lthough a claimant's allegations about his pain may not be discredited solely because they are not substantiated by objective evidence of the pain itself or its severity, they need not be accepted to the extent they are inconsistent with the available evidence, including objective evidence of the underlying impairment, and the extent to which that impairment can reasonably be expected to cause the pain the claimant alleges he suffers." 76 F.3d at 595. Specifically, the ALJ must consider "any inconsistencies in the evidence and the extent to which there are any conflicts between [the claimant's] statements and the rest of the evidence, including [his medical] history, the signs and laboratory findings, and statements by [his] medical sources or other persons about how [his] symptoms affect [him]." 20 C.F.R. § 404.1529(c)(4) (2022). The regulations direct that a claimant's "symptoms, including pain, will be determined to diminish [his] capacity for basic work activities to the extent that [his] alleged functional limitations and restrictions due to symptoms, such as pain, can reasonably be accepted as consistent with the objective medical evidence and other evidence." 20 C.F.R. § 404.1529(c)(4).

Here, the ALJ stated as follows in her decision:

> … [T]he undersigned has considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence, based on the requirements of 20 CFR 404.1529 and SSR 16-3p.
>
> … In considering the claimant's symptoms, the undersigned must follow a two-step process in which it must first be determined whether there is an underlying medically determinable … impairment(s) … that could reasonably be expected to produce the claimant's pain or other symptoms.
>
> Second, once an underlying … impairment(s) that could reasonably be expected to produce the claimant's pain or other symptoms has been shown, the undersigned must evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit the claimant's work-related activities. For this purpose, whenever statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the undersigned must consider other evidence in the record to determine if the claimant's symptoms limit the ability to do work-related activities.

(R. at 23-24.) The ALJ next turned to an analysis of Rose's symptoms, stating, in part, "After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms. …" (R. at 24.) Thus, the ALJ satisfied the first part of the two-part test for analyzing Rose's allegations about his symptoms. *See Arakas*, 983 F.3d at 95; *Craig*, 76 F.3d at 594. The real issue, therefore, is whether she correctly analyzed Rose's pain under the second part of this test. For the reasons that follow, I find that she did.

In her decision, the ALJ stated, "the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons

-15-

explained in this decision." (R. at 24.) To support this finding, the ALJ summarized Rose's testimony, including recounting his symptoms, his activities of daily living and his treatment before, during and after the relevant period. (R. at 24-25.) The ALJ noted that Rose's activities of daily living consisted of occasional woodworking, sometimes fixing things around the house, performing personal care tasks, including driving to and from the store, preparing meals and going outside when it was nice. (R. at 24, 42, 50-51.) The ALJ noted that Rose denied experiencing side effects from his pain medication, and he reported receiving pain relief from his TENS unit, ibuprofen and his 2017 surgery. (R. at 24, 47-48.) "If a symptom can be reasonably controlled by medication or treatment, it is not disabling." *Gross v. Heckler,* 785 F.2d 1163, 1166 (4th Cir. 1986).

The ALJ noted that, while Rose underwent surgery shortly after the period at issue and the date last insured, Rose reported improvement, he ambulated without assistance, and he managed his back pain conservatively with medication. (R. at 25.) The ALJ then summarized Rose's treatment records during 2016, including an MRI of his lumbar spine in March 2016 showing several disc herniations. (R. at 25.) Based on this review of the evidence, the ALJ determined that the record did not support Rose's alleged limitations regarding the ability to sit, stand, walk, lift and carry, his reported pain and the need to use a cane during the relevant period. (R. at 25.) The ALJ noted that Rose conservatively managed his pain with medication, he used a TENS unit, and he tried physical therapy and injections. (R. at 25.) She noted that Rose's treatment notes did not indicate an abnormal gait or use of a cane in 2016, and he had normal balance, coordination and fine motor skills. (R. at 25-26.) The ALJ noted that Rose was not observed to have muscle strength deficits in his upper and lower extremities, and he did not require emergency room care or hospitalization for acute back or neck pain. (R. at 26.) The ALJ further noted that

Rose did not have surgery until after the date last insured. (R. at 26.) She noted that Rose's health care providers did not note significant issues with his activities of daily living. (R. at 26.) The ALJ noted she considered Rose's degenerative disc disease of the cervical and lumbar spine and limited him to light work with postural, manipulative and environmental limitations. (R. at 26.)

For all the above-stated reasons, I find that the ALJ did not improperly disregard Rose's statements about his pain. To the contrary, the ALJ thoroughly considered such statements and credited them to the extent they were consistent with the record as a whole. As stated herein, in making the determination at the second prong of the symptom evaluation framework, the ALJ must examine the entire case record, including the objective medical evidence, the claimant's statements about the intensity, persistence and limiting effects of his symptoms, statements and other information provided by medical sources and other persons and any other relevant evidence in the claimant's record. *See* S.S.R. 16-3p, 2017 WL 5180304, at *4. Here, the ALJ reviewed Rose's relevant medical history and his subjective allegations before finding his statements regarding the severity of his limitations were not entirely credible because they were not fully supported by the objective medical evidence and his treatment history. The ALJ was entitled to find that the objective medical evidence outweighed Rose's subjective statements, and she provided a sufficient rationale for doing so. It is well-supported that a reviewing court gives great weight to an ALJ's assessment of a claimant's credibility and should not interfere with that assessment where the evidence of record supports the ALJ's conclusions. *See Shively v. Heckler*, 739 F.2d 987, 989-90 (4th Cir. 1984). Here, the ALJ's decision was thorough and applied the proper legal standard, and this court will not reweigh the evidence.

For all the foregoing reasons, I find that the ALJ's evaluation of Rose's pain was based on a correct legal standard and is supported by substantial evidence. Based on the same evidence stated above, I further find that substantial evidence supports the ALJ's residual functional capacity finding and ultimate finding that Rose was not disabled under the Act and not entitled to benefits.

## PROPOSED FINDINGS OF FACT

As supplemented by the above summary and analysis, the undersigned now submits the following formal findings, conclusions and recommendations:

1. Substantial evidence exists in the record to support the ALJ's analysis of Rose's subjective complaints of pain;

2. Substantial evidence exists in the record to support the ALJ's residual functional capacity finding; and

3. Substantial evidence exists in the record to support the Commissioner's finding that Rose was not disabled under the Act and was not entitled to DIB benefits.

## RECOMMENDED DISPOSITION

The undersigned recommends that the court deny Rose's motion for summary judgment, grant the Commissioner's motion for summary judgment and affirm the Commissioner's decision denying benefits.

## **Notice to Parties**

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636(b)(1)(C):

Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14-day period, the Clerk is directed to transmit the record in this matter to the Honorable James P. Jones, Senior United States District Judge.

The Clerk is directed to send certified copies of this Report and Recommendation to all counsel of record at this time.

DATED:   January 17, 2024.

/s/ *Pamela Meade Sargent*
UNITED STATES MAGISTRATE JUDGE